L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
**BURSOR & FISHER, P.A.**
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
         dguerra@bursor.com

Reuben D. Nathan, Esq. (State Bar No. 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (State Bar No. 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff: MURPHY MARTINES

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MURPHY MARTINES, on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>SIMPLE TIRE LLC, a Pennsylvania limited liability company,<br><br>Defendant. | Case No: 2:25-cv-06703-AB-JC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**1) CAL. PENAL CODE § 638.51** |

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED
CASE NO. 2:25-cv-06703-AB-JC

Plaintiff MURPHY MARTINES ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant SIMPLE TIRE LLC, a Pennsylvania limited liability company ("Defendant" or "Simple Tire"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.SimpleTire.com (the "Website"), a website that Defendant owns and operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To achieve these goals, Defendant enables third-party technologies, which function as unlawful pen registers and/or trap and trace devices, to capture detailed information about users' electronic communications such as Internet Protocol ("IP") addresses, session data, and clickstream activity in real time. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA") where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded or a user performs a tracked action.

/ / /

---

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          1
CASE NO. 2:25-cv-06703-AB-JC

5. When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Trackers (Analytics/Tag Manager/DoubleClick)
- Facebook Tracker
- Microsoft Bing Ads
- FullStory Session Replay Tracker

7. The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8. The Trackers are operated by distinct third parties, including Google LLC ("Google") (as to the Google Trackers, including Google Analytics, Google Tag Manager, and DoubleClick), Meta Platforms, Inc. ("Meta") (as to the Facebook Tracker), Microsoft Corporation ("Microsoft") (as to the Microsoft Bing Ads Tracker), and FullStory, Inc. ("FullStory") (as to the FullStory Session Replay Tracker) (collectively, the "Third Parties"). Defendant aids, employs, agrees, and conspires with the Third Parties by enabling the Trackers, which transmit user data to third-party servers to identify users and support advertising, profiling, behavioral analytics, and data monetization activities.

9. Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, installed fonts, color depth, time zone, operating system, pages visited, session duration, scroll depth and/or mouse movement, referring URLs, unique identifiers (such as cookies and ad IDs), and

geolocation based on IP (collectively, "User Information"). This information is used for behavioral profiling, geolocation tracking, ad targeting, cross-device tracking, and participation in real-time advertising auctions. Defendant then uses the data collected by the Trackers, and in conjunction with the Third Parties operating them, for targeted marketing and advertising that enable Defendant to monetize its Website. That is, Defendant and the Third Parties benefit from the Third Parties' unconsented-to collection of Plaintiff's and Class Members' personal information.

10. Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

11. The allegations here are made more invasive by the entities operating the Trackers and collecting Plaintiff's and Class Members' IP addresses and User Information. Google Trackers (Analytics, Tag Manager, and DoubleClick), the Facebook Tracker, and the Microsoft Bing Ads Tracker each combine the information they collect about Website users with information from other websites, adding the IP addresses and User Information of Website users to comprehensive user profiles used to track Plaintiff and Class Members across the Internet. Those data profiles are then provided to advertisers for more targeted and tailored advertising based on a broad universe of information. In addition, the FullStory Tracker captures live, session-level behavioral data including mouse movements, scroll depth, form interactions, and other signaling and addressing information in real time via live outbound stream, providing granular surveillance of users' browsing behavior and device context.

12. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way.

13. By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated CIPA § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

14. Generalized references herein to users, visitors, and consumers expressly include Plaintiff and the Class Members.

## II.   PARTIES

15. Plaintiff MURPHY MARTINES is a California citizen residing in Los Angeles County and has an intent to remain there. Plaintiff was in California when he visited the Website, including on April 9, 2025, which occurred during the class period prior to the filing of the Complaint in this matter. At the time of Plaintiff's recent visits, he was viewing the Defendant's Website for personal purposes. The allegations set forth herein are based on the Website as configured when Plaintiff visited it and such occasion(s), Plaintiff interacted with the Website's homepage (among others), which is where Defendant intentionally embedded the Trackers on Plaintiff's device for the purpose of sharing Plaintiff's personal signaling, routing, and addressing information as described herein.

16. Defendant SIMPLE TIRE LLC is a Pennsylvania limited liability company that owns, operates, and/or controls the Website, which is an online platform that offers goods and services to consumers.

17. Simple Tire is a prominent online tire retailer with a strong digital footprint in the United States, operating its main consumer platform at www.simpletire.com. Headquartered at 8 Neshaminy Interplex Drive, Suite 300, Trevose, Pennsylvania, Simple Tire enables customers to browse, select, and purchase a wide range of tires online. The platform connects shoppers to a network of independent installers and fulfillment partners, making tire buying and installation convenient for users nationwide.

18. As the principal consumer-facing brand of Simple Tire, the SimpleTire.com website is central to the company's commercial operations. It is responsible for facilitating online orders, processing customer payments, and coordinating

communications between buyers and installation partners. In running its e-commerce business, Simple Tire collects and processes significant amounts of user data for activities including order fulfillment, behavioral analytics, and targeted marketing. These data practices entail regulatory obligations under California and federal privacy laws.

19. The Website serves as Simple Tire's primary online storefront, allowing users to search for tires, compare options, save preferences, manage their accounts, and complete purchases. In addition to its retail functions, the Website also acts as a platform for behavioral tracking and digital advertising. By deploying third-party tracking technologies, such as advertising pixels, event trackers, behavioral monitoring tools, and data integration systems, Simple Tire collects detailed information regarding user interactions. These data collection practices support the company's performance marketing, ad-targeting, and audience monetization strategies, and raise important considerations under CIPA and other relevant consumer privacy statutes.

### III. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

21. This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

22. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has

intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) Plaintiff resides in this District; and (4) the injury to Plaintiff occurred within this District.

## IV.   GENERAL ALLEGATIONS

**1.**   *The California Invasion of Privacy Act (CIPA)*

23.   Enacted in 1967, the California Invasion of Privacy Act is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

24.   CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order. Cal. Penal Code § 638.51(a).

25.   A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication. Cal. Penal Code § 638.50(b).

26.   Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents. Cal. Penal Code § 638.50(b).

27.   In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

28. Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

29. Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

30. Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line, capturing the incoming information.

31. Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced

with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

32.    The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. *Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).

33.    Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer Article III Standing. *See Campbell v. Facebook, Inc.*, 2020 WL 1023350; *In re Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020).

34.    Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.    *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

35.    When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, *e.g.,* what images to load, what text should appear, or what music should play.

36.    The server's instructions cause the Trackers to be installed on users' browsers, including Plaintiff's browser. The Trackers then cause the browsers to send identifying information—including the users' IP addresses and User Information to the Third Parties. These Third Parties, through their Trackers, also set cookies on Website

users' browsers, which send a unique identifier to these Third Parties that allows them to track users both over multiple visits to the Website and across the Internet.

37.    A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

## Figure 1:



38.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, the User Information, is used to profile users and facilitate targeted advertising.

39.    The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

40.    Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED        9
CASE NO. 2:25-cv-06703-AB-JC

41. An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (*e.g.*, 191.145.132.123). IPv4 is the traditional format of IP addresses and, because it has a finite amount of combinations, it is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

42. Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

43. Public IP addresses are globally unique identifiers assigned by Internet Service Providers ("ISPs") that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

44. Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider

---

[1] *See, e.g., What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

45.    In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

46.    The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations by making those IP addresses useable for local network communications on multiple networks. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

47.    An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). A lot can be gleaned from knowing the phone number that is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

48.    The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[2]

_____

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

49. Thus, the differences between public and private IP addresses are as follows:[3]

---

accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

**<u>Figure 3:</u>**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

50.    A public IP address is therefore "routing, addressing, or signaling information." A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

51.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

52.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

53.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED            13
CASE NO. 2:25-cv-06703-AB-JC

the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

54.   Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

55.   A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

56.   In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10] For example,

---

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

57.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

58.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

59.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

60.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

---

[11] *See, e.g., Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[13] *Id.*

[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[15] *Id.*

[16] *Id.*

[17] *Id.*

61.     The collection of IP addresses is particularly invasive here: As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

62.     In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

63.     For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; see also WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/ law/law-topic/data-protection/reform/what-personal-data_en.

64.     When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

65.     Often times, third-party scripts are installed on websites "for advertising purposes."[21]

66.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

67.     Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

68.     As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

69.     Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

---

[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").
[21] *Id*.
[22] *Id*.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          17
CASE NO. 2:25-cv-06703-AB-JC

70.    Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

71.    At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**3.    *The Use of Trackers or Beacons and Digital Fingerprinting***

72.    Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

73.    The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion.

Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

74. This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

75. When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

76. The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

77. In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking

technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

78.     The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

79.     When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.     *Plaintiff And Class Members' Data Has Financial Value***

80.     Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

81.     Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

82.     There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

---

[23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444.

[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

83.     Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

84.     In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[27]

85.     The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

---

[26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey .com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data.

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring  Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

86.     Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

87.     The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.     *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

88.     By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

89.     Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad

targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

90.     IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

91.     When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

**6.     *Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy***

92.     The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

93.     As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

94.     To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

95.     In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

### a. Data Brokers And Real-Time Bidding: The Information Economy

*Data Brokers*

96.     While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

97.     Any entity that qualifies as a "data broker" under California law must specifically register as such. Cal. Civ. Code § 1798.99.82(a).

---

[29] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

98.   "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

99.   For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited. Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

100.   Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

---

[30] SHERMAN, *supra*, at 2.

[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[33] SHERMAN, *supra*, at 1.

[34] *Id*.

101.   This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

102.   As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

> …

> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

---

[35] *Id.* at 9.
[36] *Id.*

103.   Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

**Figure 4:**

DATA BROKERS AND THE INDUSTRY OF DATA

---

[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

104. As noted above, data brokers can compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[38]

105. Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

106. These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

107. In short, by collecting IP addresses, Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

108. As a result of Defendant's installation of trackers operated by data brokers, together with numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is appended to existing profiles maintained by those brokers or used to generate new ones. This linkage is accomplished through the collection of IP

---

[38] *Id.* at 11.

[39] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[40] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

addresses, device metadata, and other user information transmitted by the browsers of Defendant's Website visitors.

109.   These profiles are then served up to any companies that want to advertise to Defendant's users, and Defendant's users become more valuable because of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

110.   Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

111.   "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

112.   "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." "An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact."[42] And an Advertising Exchange "allows advertisers and publishers to use the same technological

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.
[42] *Id.*

platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[43]

113.   In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

114.   The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[44]

---

[43] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

[44] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

**Figure 5:**



115.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[45]

---

[45] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

**Figure 6:**



116. In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

117. Likewise, a DSP can generate the highest and most targeted bids from advertisers by providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

118. All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

119. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

  a. "incentiviz[ing] invasive data-sharing" by "push[ing] publishers to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and

cookie cache, which can be used to ascertain a person's browsing history and behavior."

b. "send[ing] sensitive data across geographic borders."

c. sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[46]

120.  Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[47]

121.  For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[48]:

/ / /

/ / /

/ / /

/ / /

---

[46] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.
[47] Geoghegan, *supra*.
[48] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

**Figure 7:**



122.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

123.    It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website. The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

124. Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[49] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[50]

125. Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

> …

---

[49] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[50] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[51]

**Figure 8:**



126. Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[52]

---

[51] Papadopoulos, *supra*, at 1433.
[52] Papadopoulos, *supra*, at 1434.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          36
CASE NO. 2:25-cv-06703-AB-JC

127. On the flip side, "CSync may re-identify web users even after they delete their cookies."[53] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[54] But if a tracker can "respawn" its cookie or link to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[55]

128. Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[56]

129. Cookie syncing is precisely what is happening here. When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit the Website.

130. To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same. The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most

---

[53] *Id.*

[54] *See id.*

[55] *Id.*

[56] *Id.* at 1441.

attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

131. Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

132. Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

133. Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number of advertisers themselves without knowledge or consent.

134. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

135. On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across

websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

136. Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

137. The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

## V.   SPECIFIC ALLEGATIONS

### 1.   *The Google Trackers*

138. The Google Trackers are digital analytics and tag management technologies operated by Google LLC, consisting of Google Analytics, Google Tag Manager, and DoubleClick. Together, these tools enable Google and its advertising and analytics clients to collect detailed interaction data, monitor engagement, and coordinate the deployment of additional tracking scripts. Google Tag Manager functions as a container that injects other tracking tags into the Website. Google Analytics measures and reports user behavior in granular detail for profiling, marketing optimization, and targeted

advertising purposes. DoubleClick supports ad delivery and user identification across Google's advertising network.

139.   When implemented on the Website, the Google Trackers collect a broad set of user metadata, including visited URLs, session timestamps, referrer headers, and behavioral interaction data such as page views and navigation paths. Google Analytics captures detailed technical device attributes such as IP address, screen resolution, browser type, operating system, and language settings. These data points are linked to persistent browser identifiers, often placed via cookies or JavaScript storage objects, allowing Google to track users across multiple websites, sessions, and devices, forming longitudinal behavioral profiles.

140.   The Google Trackers monitor user engagement signals on the Website, including page views, link clicks, and navigation patterns, and transmit those interaction signals to Google's analytics and advertising infrastructure. Google Analytics executes through JavaScript calls to domains such as www.google-analytics.com and analytics.google.com. Google Tag Manager is embedded within the Website and initiates requests to www.googletagmanager.com as part of the initial page load. Through this container, Google Tag Manager deploys additional Google services, including advertising and measurement tags, without any action by the user.

141.   Figure 9 below shows a captured network entry where the browser issued a GET request to https://www.googletagmanager.com/gtm/…[full URL omitted]. The visible addressing information includes the domain www.googletagmanager.com and the URL path segment "gtm." The routing information reflects a successful 200 status and a recorded time value of 0 milliseconds, while the signaling information identifies the resource type as "script." The displayed data reflects addressing, routing, and signaling metadata evidencing an outbound resource request from the browser to a remote JavaScript endpoint because it records the connection parameters and response attributes that define how the client established and completed communication with an external server.

**Figure 9**



142. Figure 10 below shows a recorded POST request directed to https://analytics.google.com/g/… [full URL omitted]. The visible addressing information identifies the destination domain analytics.google.com and the referring origin https://simpletire.com. The routing information reflects a 204 No Content status and a remote IPv6 address (2607:f860:4007:814:2008:277). The signaling information includes response headers such as Access-Control-Allow-Credentials, Access-Control-Allow-Origin, Content-Security-Policy-Report-Only, Cross-Origin-Opener-Policy-Report-Only, and Cross-Origin-Resource-Policy, along with the Server field (Golfe2) and Date stamp (Tue, 15 Apr 2025 17:14:54 GMT). The displayed data reflects addressing, routing, and signaling metadata evidencing a cross-origin POST transaction between the site and Google's analytics endpoint, because it details the precise connection route, permission headers, and transmission attributes that define how the browser communicated with a remote analytics server.

/ / /

**Figure 10**



143. Figure 11 below shows an HTTPS POST request to the domain analytics.google.com with a visible request string beginning "POST /hETV8:801031522250200916.284/24831162841528-19597538693420…" and containing numerous query parameters including cid="1abce328-bcd1-4691-a198-04dcdb14f250," uid="834ae0e0-1818-4504-9ac5-418085ed427d," sid="1759753712451," and host referrer "https://simpletire.com." The request headers identify "Host: analytics.google.com," "Connection: keep-alive," "User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/140.0.0.0 Safari/537.36," "Sec-Fetch-Site: cross-site," and "Referer: https://simpletire.com/." The response headers include "HTTP/1.1 204 No Content," "Cache-Control: no-cache, no-store, must-revalidate," "Access-Control-Allow-Credentials: true," and "Access-Control-Allow-Origin: https://simpletire.com." The displayed data constitutes addressing and signaling metadata because it records the specific domain names, header fields, and parameterized identifiers used in the network exchange between the browser and analytics.google.com,

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          42
CASE NO. 2:25-cv-06703-AB-JC

providing a verifiable account of how the client device connected and transmitted information over HTTPS to an external endpoint.

**Figure 11**



144. Figure 12 below shows a series of DNS query and response entries identifying multiple domains including www.googletagmanager.com, www.google.com, docs.google.com, and clientservices.googleapis.com. Addressing information consists of the listed domain names. Routing information is reflected in the alternating query and response records, including resolved A records showing the IP addresses 142.250.189.164, 142.250.189.238, and 142.250.189.163. Signaling details appear through the DNS protocol references and transaction identifiers shown beside each query and response. The displayed data reflects addressing, routing, and signaling metadata evidencing live DNS resolution sequences between the browser and multiple remote Google-controlled domains because it records the query-response exchanges that established how the client located and communicated with external network endpoints.

/ / /

**Figure 12**



145.    Figure 13 below shows cookie and storage data visible within the browser's application storage panel, listing multiple domains including simpletire.com, www.googletagmanager.com, www.google.com, twitter.com, t.co, and bing.com. Addressing information is evident in the domain column associated with numerous cookie names such as _ga, _ga_8NR458M86V, _ga_G97TYG25H0, _gcl_au, _uetsid, and _uetvid, along with values containing unique identifiers, encoded strings, and alphanumeric tokens. Other metadata categories include session and expiration timestamps, size, and security attributes indicating session persistence and partitioning. The displayed data reflects addressing, routing, and signaling metadata evidencing the browser's active stateful interactions with multiple external domains because it documents domain-specific identifiers, cookie parameters, and retention properties that define how session and user data were stored and communicated across the connected endpoints.

/ / /

**Figure 13**



146. Figure 14 below shows network request information associated with analytics.google.com. Addressing information includes the domain analytics.google.com and a reference origin of https://simpletire.com/…[full URL omitted]. Routing and signaling metadata are visible in the headers, showing directives such as "Cache-Control: no-cache, no-store, must-revalidate," "Content-Type: text/plain," and cross-origin policies defining same-origin and cross-origin handling. Additional signaling data include "Accept-Encoding: gzip, deflate, br," the "User-Agent" string identifying a Safari 17.4.1 browser on macOS 10.15.7, and connection values such as "keep-alive" and "no-cors cross-site." The displayed data reflects addressing, routing, and signaling metadata evidencing a live browser-to-server communication between the simpletire.com site and analytics.google.com because it records the header parameters, connection directives, and access-control configurations defining how the browser transmitted the request across domains.

/ / /

**Figure 14**



147.   Defendant surreptitiously installed and executed the Google Trackers onto users' browsers by embedding Google Tag Manager within the Website's source code. When a user visits the Website, their browser automatically executes the container script, which dynamically injects Google Analytics and DoubleClick tags, initiating outbound network requests to Google's servers that transmit metadata including page URL, referrer information, browser details, IP address, and session identifiers as part of a third-party tracking, profiling, and advertising system.

148.   The Google Trackers are at least a "process" because they are software systems that identify consumers, gather data, and correlate that data.

149.   The Google Trackers are at least a "device" because in order for software to function, it must be executed on computing hardware. *See James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

150.   The Google Trackers function as a pen register and/or trap-and-trace device under the California Invasion of Privacy Act because they capture outgoing signaling data such as URLs visited, click paths, timestamps, and referrer headers, and also process incoming metadata such as analytics responses and cookie-based session identifiers.

These transmissions occur automatically during page load and without user participation, enabling Google to continuously log user behavior and associate it with broader tracking profiles.

151. Defendant never obtained a court order permitting the installation of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or Class Members' express or implied consent to install the Google Trackers or to collect or share data with Google.

152. Consequently, the Google Trackers violate the California Invasion of Privacy Act concerning the unauthorized use of a pen register and/or trap-and-trace device without prior consent or court order.

### 2. *The Facebook Tracker*

153. The Facebook Trackers are digital advertising and analytics technologies operated by Meta, including the Facebook Pixel and associated JavaScript libraries (such as fbevents.js). These tools enable Meta to record user interactions, monitor website activity, and link those behavioral events to Meta's broader advertising and identity graph. The Facebook Pixel functions as a web beacon that transmits information about page views and navigation events from the Website to Meta's tracking infrastructure.

154. When embedded in a website, the Facebook Trackers collect routing, addressing, and behavioral data including visited URLs, referrer headers, timestamps, page titles, and device characteristics. The data are appended to user identifiers stored in browser cookies or local storage—such as the fbp cookie—allowing Meta to track users across multiple websites and associate the resulting signals with Facebook accounts or shadow profiles used for behavioral advertising.

155. Figure 15 below shows three network requests associated with the domain connect.facebook.net. Addressing information is visible through the listed URLs beginning with https://connect.facebook.net/signals/config/…[full URL omitted] and https://connect.facebook.net/en_US/fbevents.js, each using the GET method. Routing information is shown in the status column, which records HTTP 200 responses

indicating successful delivery of each script. Signaling data include the listed resource types identified as "script," confirming that JavaScript assets were retrieved from the specified domain. The displayed data reflects addressing, routing, and signaling metadata evidencing an active cross-domain connection between the browser and connect.facebook.net because it records the external script requests, response statuses, and file types establishing how the browser exchanged executable resources with a remote endpoint.

**Figure 15**

156.   Figure 16 below shows network request data associated with the domain www.facebook.com. Addressing information includes the visible request URL beginning with https://www.facebook.com/tr/…[full URL omitted], which corresponds to two separate GET requests returning a 200 OK status. Routing metadata includes the remote address field showing a resolved IPv6 address beginning with 2607:f860:4007:814:2008:299. Signaling information is reflected in response headers such as "Access-Control-Allow-Origin," "Content-Type: text/plain," "Cross-Origin-Resource-Policy: cross-origin," and "Strict-Transport-Security: max-age=31536000; includeSubDomains," along with indicators of connection quality recorded as

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          48
CASE NO. 2:25-cv-06703-AB-JC

"EXCELLENT." The displayed data reflects addressing, routing, and signaling metadata evidencing an active HTTPS communication between the browser and the facebook.com server because it records the specific URL requests, response codes, and header values that document how the browser transmitted and received content across the external network endpoint.

**Figure 16**

157.    Figure 17 below shows parameterized request and response data associated with an HTTPS communication identifying multiple fields labeled "id," "ev," "rl," "ts," "sw," "sh," "ec," "fbp," and "rqm," along with corresponding numeric and textual values. Addressing elements include the visible domain reference to https://simpletire.com/…[full URL omitted] and identifiers such as "174100579852978" and "fb.1.1759753872978.609125752861485266." Routing and signaling metadata are reflected in the HTTP/1.1 200 OK status and associated headers, including "Content-Type: text/plain," "Access-Control-Allow-Credentials: true," "Access-Control-Allow-Origin," "Strict-Transport-Security: max-age=3153," "Connection: keep-alive," and "Server: proxygen-bolt." The displayed data reflects addressing, routing, and signaling metadata evidencing an authenticated browser exchange with a remote server because it

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED            49
CASE NO. 2:25-cv-06703-AB-JC

documents the parameterized identifiers, response status, and cross-origin permissions defining the network path and communication conditions between endpoints.

**Figure 17**



158.   Figure 18 below shows multiple stored cookies and related metadata visible under the "Application" and "Cookies" panes. Addressing information includes domain entries such as simpletire.com, forms.simpletire.com, lightboxcdn.com, www.google.com, twitter.com, and bat.bing.com. Each row lists corresponding cookie names like "_cfuvid," "fbp," "_ga," "_ga_8NR458M86V," "_uetvid," and "_vwo_uuid," along with encoded values and expiration timestamps ranging between 2025 and 2026. Routing and signaling metadata appear through structured storage parameters including "Secure," "SameSite," and "Partition" fields, which define the browser's permitted exchange and isolation behaviors for each domain entry. The displayed data reflects addressing, routing, and signaling metadata evidencing active cross-domain communication and stored state identifiers between the browser and multiple remote servers because it records the specific domain associations, cookie names, and transmission permissions that define how session data and connection parameters were maintained within the network environment.

**Figure 18**



159.  Figure 19 below shows a sequence of DNS queries and responses directed to connect.facebook.net and www.facebook.com. Addressing information includes the queried domains connect.facebook.net and www.facebook.com, each associated with multiple record types including HTTPS, AAAA, and A. Routing data is shown in the corresponding responses that map connect.facebook.net to the canonical name scontent.xx.fbcdn.net and www.facebook.com to star-mini.c10r.facebook.com, with visible IP addresses 157.240.239.1 and 163.70.146.35, and IPv6 addresses beginning with 2a03:2880:. The displayed data reflects addressing, routing, and signaling metadata evidencing successful DNS resolution and established endpoint translation between the browser and the facebook.com network infrastructure because it documents the explicit domain queries, canonical mappings, and resolved IP records that define how those endpoints were located and addressed within the network exchange.

/ / /

**Figure 19**



160.    Figure 20 below shows HTTPS and HTTP session entries displaying communications involving the domains connect.facebook.net and www.facebook.com. Addressing information includes URLs such as https://connect.facebook .net/signals/config/…[full URL omitted] and https://www.facebook.com/tr/…[full URL omitted], along with tunneling entries to www.facebook.com:443. Routing metadata appears through the visible HTTP/1.1 200 OK status and the response headers, including "Access-Control-Allow-Credentials: true," "Access-Control-Allow-Origin," "Strict-Transport-Security: max-age=31536000; includeSubDomains," "Alt-Svc: h3=':443': ma=86400," and "Connection: keep-alive." Signaling data includes the "User-Agent" identifying a Windows 10 Chrome 140 browser, "Accept" and "Accept-Encoding" fields, "Cache-Control: no-cache," and the referer "https://simpletire.com/." The displayed data reflects addressing, routing, and signaling metadata evidencing a cross-domain HTTPS exchange between the browser and the facebook.com network because it records the explicit endpoints, response permissions, and transmission attributes

defining the established connection and its operational parameters within the network ecosystem.

**Figure 20**

161. Defendant surreptitiously installed and executed the Facebook Trackers onto users' browsers by embedding Facebook's Pixel code in the Website's source code. When a user visits the Website, their browser automatically executes the embedded JavaScript, which initiates outbound network requests to Meta's servers transmitting data including the page URL, referrer, browser details, session timestamp, and the fbp identifier as part of Meta's cross-site tracking and ad-profiling system.

162. The Facebook Trackers are at least a "process" because they are software systems designed to identify consumers, gather technical and behavioral data, and correlate that data across sessions and domains.

163. The Facebook Trackers are at least a "device" because, for software to operate, it must execute on computing hardware. *See James*, 2023 WL 7392285, at *13*.

164.   The Facebook Trackers function as a pen register and/or trap-and-trace device under the California Invasion of Privacy Act because they capture outgoing signaling data such as URLs visited, referrer headers, timestamps, and click paths, and also process incoming metadata such as response codes and cookie-based session identifiers. These transmissions occur automatically and without user participation, allowing Facebook to continuously log and associate users' browsing activity with their profiles for behavioral targeting.

165.   Defendant never obtained a court order permitting the installation of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or Class Members' express or implied consent to install the Facebook Trackers or to collect or share their data with Facebook.

166.   Consequently, the Facebook Trackers violate the California Invasion of Privacy Act concerning the unauthorized use of a pen register and/or trap-and-trace device without prior consent or court order.

### 3.    The Bing Ads Tracker

167.   The Bing Ads Trackers are digital advertising and analytics technologies operated by Microsoft Corporation through its Bing Ads and Microsoft Advertising platforms. These scripts collect behavioral and technical data from users to measure conversions, retarget visitors, and optimize ad delivery. The tracker operates through Microsoft's "bat.bing.com" endpoint, which receives event data and browser identifiers generated by the embedded JavaScript library bat.js.

168.   When deployed on the Website, the Bing Ads Trackers collect signaling and behavioral data such as visited URLs, referrer headers, timestamps, page titles, and session identifiers. The tracker further transmits device and browser metadata including IP address, operating system, language, screen resolution, and unique identifiers assigned through cookies or session storage. This information enables Microsoft to follow users across multiple sessions and to link their Website activity to advertising campaigns and behavioral profiles maintained in its advertising network.

169.   Figure 21 below shows an HTTPS request directed to https://bat.bing.com/action/…[full URL omitted], identified by the domain bat.bing.com under the "Name" field. The request method is GET with a 204 No Content status response, indicating successful receipt without returned body data. Addressing information includes the remote address 2607:f860:4007:814::2008:298 and visible response headers such as "Access-Control-Allow-Origin," "Cache-Control: no-cache, must-revalidate," and "Strict-Transport-Security: max-age=31536000; includeSubDomains; preload." Additional routing and signaling elements include cookie directives "MUID=0EF31841C23664A7238A0D8EC3A465DC" and "MR=0" with domains .bing.com and bat.bing.com, expiration values, and secure transmission attributes ("SameSite=None; Secure"). The displayed data reflects addressing, routing, and signaling metadata evidencing a remote HTTPS communication with the bat.bing.com endpoint because it records the explicit request structure, response permissions, and transport security parameters that define the exchange between the browser and the external server within the network ecosystem.

**Figure 21**



FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED           55
CASE NO. 2:25-cv-06703-AB-JC

170. Figure 22 below shows an HTTPS request directed to https://bat.bing.com/action/…[full URL omitted], corresponding to the domain bat.bing.com under the "Name" and "Request URL" fields. The request method is GET and the status code is 204 No Content, confirming a completed request with no body data. Addressing information identifies the remote address 2607:f860:4007:814::2 008:298 and multiple response headers including "Access-Control-Allow-Origin," "Cache-Control: no-cache, must-revalidate," "Strict-Transport-Security: max-age=3153 6000; includeSubDomains; preload," and "X-Msedge-Ref." Signaling elements include cookie instructions "MUID=0EF31841C23664A7238A0D8EC3A465DC" for the domain .bing.com and "MR=0" for bat.bing.com, both with explicit expiration timestamps, secure flags, and SameSite=None attributes. The displayed data reflects addressing, routing, and signaling metadata evidencing a structured HTTPS communication between the browser and the bat.bing.com endpoint because it records the precise request path, connection security parameters, and server-issued directives defining the established network exchange.

**Figure 22**



171. Figure 23 below shows a "Query String" parameter table from a captured network request, listing paired parameter names and their corresponding literal values as displayed. Each line presents a visible name–value association, including "tm=gtm002," "uach=pv=10.0.0," "mid=9a87489a-7b9c-4218-bd75-ec23037a8d8e," "sid=57ce0f70a2a511f082f305898d96a0d0," "vid=57ce3340a2a511f0b91bb17fa905fc3a," "lg=en-US," "sw=1536," "sh=864," "tl=Buy Automotive Tires Online for Less | SimpleTire," and "=https://simpletire.com." The table also includes numeric values such as "918639831," "24," and character fields "evt=pageLoad," "spa=Y," and "cdb=AQAQ." These items appear under a single structured query set, reflecting the browser's transmission of defined keys and values to the remote endpoint. The displayed data represents addressing and signaling metadata because it documents the precise query parameters and their literal entries that governed how the browser composed and transmitted this request within the network exchange.

## **Figure 23**



172. Figure 24 below shows a section of a network log containing visible request and response headers for a connection to the domain bat.bing.com, identified in the

"Host" field. The visible paired fields include request header entries such as "Accept=image/webp,image/avif,image/jxl,image/heic,image/heic-sequence,video/*; q=0.8,image/png,image/svg+xml,image/*;q=0.8,*/*;q=0.5," "Accept-Encoding=gzip, deflate, br," "Accept-Language=en-US,en;q=0.9," "Connection=keep-alive," "Referer= https://simpletire.com/…[full URL omitted]," "Sec-Fetch-Dest=image," "Sec-Fetch-Mode=no-cors," and "Sec-Fetch-Site=cross-site." The visible response headers include "Cache-Control=no-cache, must-revalidate," "Pragma=no-cache," "Set-Cookie=MUI D=0EF31841C23664A7238A0D8EC3A465DC; domain=.bing.com; expires=Sun, 10-May-2026 17:14:54 GMT; path=/; SameSite=None; Secure; Priority=High," "Strict-Transport-Security=max-age=31536000; includeSubDomains; preload," and "Access-Control-Allow-Origin." Configuration entries "Ref A: 7537CC53F85D4E99 9AD5498F88F3053E," "Ref B: LAX311000109023," and "Ref C: 2025-04-15T17 :14:54Z" are also displayed. The displayed data reflects addressing, routing, and signaling metadata because it records the explicit parameters, identifiers, and header values through which the browser communicated with the external endpoint.

**Figure 24**



173. Figure 25 below shows DNS query and response entries identifying multiple lookups for the domain bat.bing.com. The visible sequence lists three "Standard query" requests: one for "HTTPS bat.bing.com," one for "AAAA bat.bing.com," and one for "A bat.bing.com," followed by corresponding "Standard query response" entries for each request. Each response maps bat.bing.com to the canonical name "bat-bing-com.ax-0001.ax-msedge.net," repeated for HTTPS, AAAA, and A record types. The displayed data constitutes addressing and routing metadata because it records the resolved domain relationships, query types, and returned canonical names that define how the browser's DNS resolver located and connected to the external endpoint.

**Figure 25**



174. Figure 26 below shows a display of stored cookie data associated with multiple domains, including entries under simpletire.com, forms.simple…, lightb oxcdn…, googletagmanager…, google.com, and twitter.com. The visible table includes paired fields such as "Name," "Value," "Domain," and "Expires / Max-Age," with example values including "_cfuvid," "_fbp," "_ga," "_ga_8NR458M86V," "_ga_G97T YG25H0," "uetsid," and "uetvid." Each entry presents corresponding expiration

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    59
CASE NO. 2:25-cv-06703-AB-JC

timestamps such as "2025-10-06T13:32:33.0…" and "2026-11-10T13:25:52.3…," along with security attributes labeled "Secure" and "Partitioned" shown with values like "None," "Strict," and "Lax." The displayed data reflects addressing and signaling metadata because it captures the active cookies, identifiers, and associated attributes that document how the browser maintained persistent connections, stored stateful session data, and preserved parameters across exchanges with multiple external endpoints.

**Figure 26**



175.   Defendant surreptitiously installed and executed the Bing Ads Trackers onto users' browsers by embedding Microsoft's bat.js script within the Website's source code. When a user visits the Website, the script automatically executes, triggering network requests to bat.bing.com that transmit page URL, referrer, session identifiers, and device information to Microsoft for tracking and advertising purposes.

176.   The Bing Ads Trackers are at least a "process" because they are software systems designed to identify consumers, gather technical and behavioral data, and correlate that data across Microsoft's advertising ecosystem.

177.   The Bing Ads Trackers are at least a "device" because, for software to operate, it must execute on computing hardware. *See James*, 2023 WL 7392285, at *13*.

178.   The Bing Ads Trackers function as a pen register and/or trap-and-trace device under the California Invasion of Privacy Act because they capture outgoing signaling data such as URLs visited, timestamps, and referrer headers, as well as incoming metadata such as response codes and cookie identifiers. These transmissions occur automatically and without user consent, enabling Microsoft to continuously log and associate user activity for targeted advertising.

179.   Defendant never obtained a court order permitting installation of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or Class Members' express or implied consent to install the Bing Ads Trackers or to share data with Microsoft.

180.   Consequently, the Bing Ads Trackers violate the California Invasion of Privacy Act concerning the unauthorized use of a pen register and/or trap-and-trace device without prior consent or court order.

### 4.   The FullStory Session Replay Tracker

181.   The FullStory Trackers are session-replay and behavioral analytics technologies operated by FullStory. They record detailed user interactions on a website—including mouse movements, scrolling, page navigation, keystrokes, and other behavioral signals—to generate continuous playback of user sessions. These recordings allow FullStory and its business clients to reconstruct user activity, including the contents of viewed pages and input fields, in real time.

182.   When embedded on the Website, the FullStory Trackers automatically collect and transmit data including page URLs, referrer headers, session identifiers, timestamps, viewport dimensions, and DOM structure of the visited page. The trackers also record granular device and browser metadata such as operating system, screen resolution, and language settings, which are linked to persistent unique identifiers to re-

identify the same browser in later sessions. These transmissions occur through network requests to edge.fullstory.com and rs.fullstory.com.

183.   Figure 27 below shows six sequential HTTPS GET requests to the domain edge.fullstory.com, each loading the resource path "/s/fs.js." The entries display identical Request URLs—formatted as https://edge.fullstory.com/s/…[full URL omitted]—with corresponding HTTP 200 status codes. Each row lists the Type as "script," the Domain as "edge.fullstory.com," and incremental load times of 0 ms, 0 ms, 0 ms, 197 ms, 642 ms, and 1.51 s. The displayed data constitutes addressing, routing, and signaling metadata because it documents repeated script retrievals, the associated host domain, network timing intervals, and successful response codes that verify the exchange parameters and delivery sequence used by the browser when connecting to the external endpoint.

**Figure 27**

| Name | Url | Meth... | Status | Domain | Type | Time |
|------|-----|---------|--------|--------|------|------|
| fs.js | https://edge.fullstory.com/s/fs.js | GET | 200 | edge.fullstory.com | script | 0 ms |
| fs.js | https://edge.fullstory.com/s/fs.js | GET | 200 | edge.fullstory.com | script | 0 ms |
| fs.js | https://edge.fullstory.com/s/fs.js | GET | 200 | edge.fullstory.com | script | 0 ms |
| fs.js | https://edge.fullstory.com/s/fs.js | GET | 200 | edge.fullstory.com | script | 197 ms |
| fs.js | https://edge.fullstory.com/s/fs.js | GET | 200 | edge.fullstory.com | script | 642 ms |
| fs.js | https://edge.fullstory.com/s/fs.js | GET | 200 | edge.fullstory.com | script | 1.51 s |

184.   Figure 28 below shows a Request Payload containing structured parameter–value fields explicitly displayed under the View source section. Entries include "OrgId: 'Q1WHG'," "UserId: '90bc9312-5dd4-403a-8ddd-8272502c204e'," "Base: 'https://sim

pletire.com/tire-deals'," "CompiledTimestamp: 1744396207," "Doctype: '<!DOCTYPE html>'," "Height: 942," "PageId: '96d77ce5-6b2d-4423-ad62-99ad59e98c75',"" "ScreenHeight: 1107," "ScreenWidth: 1710," "SessionId: '69664040-f582-4587-a964-f419f0497776',"" "SnippetVersion: '1.2.0',"" "TabId: '11cdc40ce139100',"" and "Url: 'https://simpletire.com/tire-deals'." The displayed data records concrete addressing and signaling metadata—comprising identifiers, dimensions, and session attributes—that define how the browser generated and communicated request content to the external endpoint.

**Figure 28**



185.    Figure 29 below shows an HTTPS request to the domain edge.fullstory.com with the visible URL path /rec/bundle/…[full URL omitted], along with additional connections to simpletire.com, simpletire-dataplane.rudderstack.com, and a forter.com CDN hostname. Within the visible Query String table, parameter–value pairs appear, including OrgId "Q1WHG," UserId "6b68a8ff-5ad5-49b4-bc1d-ed80d361501f," SessionId "b4eb0f28-c40d-441f-9ef0-5291c790f395," PageId "eaef7fc8-e235-40d1-bcbc-0476e474b474," and CompiledVersion "b5dea7263ec859343044065a83e12c3101

fce841." The Response Headers section shows "HTTP/1.1 200 OK," "content-type: application/json; charset=utf-8," "access-control-allow-origin: https://simpletire.com," and "Alt-Svc: h3=':443'; ma=2592000." The displayed data provides verifiable addressing, routing, and signaling metadata because it documents the exact hostnames, connection tunnels, response headers, and transmitted parameters that record how the browser established and maintained secure communication with multiple external endpoints.

**Figure 29**



186. Figure 30 below shows an HTTPS exchange with the domain rs.fullstory.com, where the visible header fields include Access-Control-Allow-Credentials "true," Access-Control-Allow-Origin "https://simpletire.com," Alt-Svc "h3=":443"; ma=2592000,h3-29=":443"; ma=2592000," Content-Encoding "gzip," Content-Length "663," Content-Type "application/json; charset=utf-8," Date "Tue, 15 Apr 2025 17:14:53 GMT," and Via "1.1 google." The corresponding Request Headers list Accept "/," Accept-Encoding "gzip, deflate, br," Accept-Language "en-US,en;q=0.9," Connection "keep-alive," Content-Length "565," Content-Type

"text/plain," Host "rs.fullstory.com," Origin "https://simpletire.com," and User-Agent beginning with "Mozilla/5.0 (Macintosh; Intel Mac OS X 10 15 7)." The displayed data provides verifiable addressing and signaling evidence because it contains the explicit request and response header fields documenting how the browser connected to rs.fullstory.com and exchanged encoded JSON content with the origin at simpletire.com through HTTPS routing.

**Figure 30**

187.    Figure 31 below shows a structured cookie table listing visible entries associated with multiple domains including .simpletire.com, simpletire.com, .twitter.com, .bat.bing.com, .t.co, .bing.com, and www.google.com. Each row presents paired fields identifying cookie names and corresponding values such as _vis_opt_exp_81_combi, vwo_uuid_v2, forterToken "c6e5fda8c7da4fb…," fs_uid "#Q1WHG#6b68a8ff-5ad5-49b4-bc1d-ed80d361501f:b4eb0f28-c40d-441f-9ef0-5291c790f395:1759749142462::6#/1791285153," MUID, and personalization_id. The visible columns also include Expires/Max-Age timestamps like "2026-01-14T12:31:05.0..." and Secure attributes such as None, Strict, and Lax. The displayed data

constitutes direct addressing, signaling, and session evidence because it enumerates explicit cookie identifiers, values, expiration times, and host associations recorded by the browser during communication with these domains, reflecting the established session state and metadata governing those network exchanges.

**Figure 31**

188.    Defendant embedded the FullStory Trackers in the Website's source code, causing each user's browser to execute fs.js and send interaction and system data to FullStory's servers. When a user visits the Website, these scripts record and transmit real-time session data—including page content, structure, and interaction signals—to a third-party host operated by FullStory.

189.    The FullStory Trackers constitute at least a "process" because they identify consumers, gather behavioral and technical data, and correlate that data with persistent identifiers for cross-session analysis.

190.    The FullStory Trackers are at least a "device" because software must execute on computing hardware. *See James*, 2023 WL 7392285, at *13*.

191. The FullStory Trackers function as a pen-register and/or trap-and-trace device under the California Invasion of Privacy Act because they capture outgoing signaling data such as page URLs, referrer headers, viewport dimensions, and session identifiers, while also recording incoming metadata such as DOM structure and analytics responses. These transmissions occur automatically and continuously, allowing FullStory to log user behavior in a way that identifies the user's browser, device, and actions over time.

192. Defendant never obtained a court order authorizing installation of a pen register or trap-and-trace device or process, and did not obtain Plaintiff's or Class Members' express or implied consent to install the FullStory Trackers or to share their data with FullStory.

193. Accordingly, the FullStory Trackers violate the California Invasion of Privacy Act prohibiting the unauthorized use of a pen register and/or trap-and-trace device without prior consent or court order.

## VI.   CLASS ALLEGATIONS

194. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

195. The Class does not include (1) Defendant, its officers, and/or directors; (2) the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and family; and (4) Plaintiff's counsel and Defendant's counsel.

196. Plaintiff reserves the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

197. **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

198. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Defendant violated CIPA;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

199. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

200. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

201. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against Defendant*

202. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

203. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

204. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

205. Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072 (C.D. Cal. 2024).

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates CIPA;

3. An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

4. An order enjoining Defendant's conduct as alleged herein;

5. Disgorgement of profits resulting from unjust enrichment;

6. Statutory damages pursuant to CIPA;

7. Prejudgment interest;

8. Reasonable attorney's fees and costs; and

9. All other relief that would be just and proper as a matter of law or equity.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Dated:   October 16, 2025          Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ *L. Timothy Fisher*
          L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          dguerra@bursor.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan, Esq. (SBN 208436)
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff and the Putative Class*